CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

8/1/2018
JULIA C. DUDLEY, CLERK
BY:  s/ Carmen Amos
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

DARTON ENVIRONMENTAL, INC.,

*Plaintiff,*

v.

FJUVO COLLECTIONS, LLC, *ET AL.*,

*Defendants.*

CASE NO. 6:17-CV-00072

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

Plaintiff Darton Environmental refines cooking oil and sells it to biofuel companies. Three of the Defendants, Andy Chen, Daniel Zheng, and Adam Zheng, visited Plaintiff on behalf of Defendant FJUVO Collections. Like Plaintiff, Defendant FJUVO Collections collects, refines, and sells cooking oil. At this visit, Plaintiff and Defendant FJUVO entered into a contract whereby Defendant FJUVO would be allowed to inspect Plaintiff's refining facility "solely for the purpose of evaluating a potential business relationship" in exchange for providing Plaintiff with truckloads of oil. Defendant FJUVO delivered Plaintiff the oil. However, Plaintiff alleges Defendant FJUVO and two spinoff companies, Defendants TG Recycle Oil and Green Oil Recycle, used its proprietary technology for their own ends. Plaintiff alleges that this violated Virginia tort law, contract law, and trade secret law.[1] While the majority of these claims must be dismissed, the trade secret claims are adequately pled. Defendants' motion to dismiss will be granted only in part.

---

[1]  This Court has diversity jurisdiction. 28 U.S.C. § 1332. Plaintiff is a citizen of Virginia. All Defendants, and their members, are citizens of other states. Daniel Zheng is citizen of Indiana. Adam Zheng is citizen of Indiana. Andy Chen is citizen of Tennessee. Daniel Zheng is the sole member of TG Recycle Oil, LLC. *See Cent. W. Virginia Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) (an LLC's citizenship is that of its members). FJUVO Collection, LLC's members are Zusong Wang of Indiana, Jingxiag Liu of Tennessee, Minxiu Liu of Indiana, Yiran Chen of New York, Mengjuan Wang of Indiana, Hengku Huang of Indiana, Yanfang Chen of Indiana, and Andy Chen of Tennessee. Green Oil Recycle, Inc. is a citizen of Indiana.

# I. LEGAL STANDARD

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. "To survive a motion to dismiss, Plaintiffs' factual allegations, taken as true, must 'state a claim to relief that is plausible on its face.'" *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "When ruling on a motion to dismiss, courts must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* However, a court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). Finally, "a court may consider documents attached to the complaint or the motion to dismiss so long as they are integral to the complaint and authentic." *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012).

# II. FACTS AS ALLEGED

## A. The parties

Plaintiff Darton Environmental "is a corporation engaged in the business of collecting and refining used cooking oil and selling it to biofuel companies." (Dkt. 50 at ¶9).

Defendant FJUVO Collections "has historically been primarily engaged in collecting, refining and selling used cooking oil." (*Id.* at ¶10). Defendants Andy Chen, Daniel Zheng, and Adam Zheng have each served as agents of FJUVO. (*Id.* at ¶¶10, 17–18).

Defendant Andy Chen is also the principal of Defendant TG Recycle Oil. (*Id.* at ¶11). Like Plaintiff and Defendant FJUVO, Defendant TG Recycle Oil is "engaged in collecting, refining and selling used cooking oil." (*Id.*). It "is a spin-off company of FJUVO." (*Id.*).

Defendant Daniel Zheng also serves as the principal of Defendant Green Oil Recycle,

Inc. (*Id.* at ¶12). Defendant Green Oil Recycle is "engaged in collecting, refining and selling used cooking oil." (*Id.*).

## B. Prior business dealings

Before this dispute, FJUVO "collected and supplied [Darton] with used cooking oil for [Darton]'s refining operation." (Dkt. 50 at ¶13). Darton "refines the cooking oil through a process called 'heat and settle' involving superheated water, which separates waste material from the oil." (*Id.* at ¶9). This process was "significantly less labor-intensive and less costly" than the refining method FJUVO had previously used. (*Id.* at ¶15).

## C. Negotiations and the agreements

FJUVO began negotiating with Darton for use of its technology in 2015. (Dkt. 50 at ¶16). Andy Chen, Daniel Zheng, and Adam Zheng negotiated on behalf of FJUVO. (*Id.* at ¶17). Daryl Hubbard negotiated on behalf of Darton. (*Id.* at ¶18). The parties agreed to allow FJUVO to inspect Darton's refining facility "solely for the purpose of evaluating a potential business relationship" in exchange for "six truckloads of oil per month for eighteen months." (*Id.* at ¶¶24–25). Each truckload contained at least 45,000 pounds. (Dkt. 7-1). Darton would pay "one cent below the IL Jacobsen market price" for the oil, and could re-sell it for two cents over the market price. (Dkt. 50 at ¶25). On October 21, 2015, the parties entered into the "buy and sell" agreement, memorializing these terms. (*Id.* at ¶29; dkt. 7-1). That same day, the parties also executed non-compete and confidentiality agreements. (Dkt. 50 at ¶32; dkt. 7-1; dkt. 7-2). These agreements made clear that FJUVO was to "use the Confidential Information only for the purpose of evaluating potential business and investment relationships with [Darton]." (Dkt. 7-2). The agreements were signed for FJUVO by Andy Chen and for Darton by Daryl Hubbard. (Dkt. 50 at ¶43).

**D.     FJUVO begins using Darton technology and selling refined oil**

Darton then "allowed Chen and Daniel and Adam Zheng to examine the proprietary equipment at the Darton refinery. Daniel Zheng also took photographs of the equipment." (Dkt. 50 at ¶44). Afterwards, "FJUVO quickly set up its own refinery in Hammond, Indiana, and later converted its old centrifuge refinery in Murfreesboro, Tennessee to a 'heat and settle' facility using the Darton technology, and began selling refined oil therefrom." (*Id.* at ¶47). Defendants Andy Chen and TG Recycle Oil used the Darton technology in Defendant TG Recycle Oil's refinery in Highland, Indiana. (*Id.* at ¶48). Likewise, Defendants Daniel Zheng and Green Oil Recycle used the Darton technology at their refinery in Highland, Indiana. (*Id.* at ¶49). Defendants began selling this refined oil to other buyers. (*Id.* at ¶¶52, 54).

## III.  DISCUSSION

Plaintiff's seven counts include claims for breach of contract, conversion, tortious interference with business expectancy, Virginia statutory business conspiracy, common law conspiracy, and violations of the Virginia Uniform Trade Secrets Act.[2] The Court takes them one at a time.

**A.     Count I: Breach of Contract**

Plaintiff alleges Defendant FJUVO breached the contract the parties signed. Plaintiff concedes this claim is only against Defendant FJUVO. Plaintiff also concedes the "buy and sell" agreement was completed, and so the breach of contract claim turns on alleged breaches of the

---

[2]     Plaintiff also includes a separate claim for "constructive trust." But as Plaintiff agreed in its opposition, a constructive trust is a remedy, not an independent cause of action. *See Johnson v. D & D Home Loans Corp.*, No. 2:07cv204, 2007 WL 4355278, at *4 (E.D. Va. Dec. 6, 2007) ("The court shall recognize the Johnsons' plea for constructive trust or resulting trust as a remedy but not as a separate cause of action."). Accordingly, Count VII will be dismissed as an independent cause of action.

non-compete and confidentiality agreements.[3]  "[T]he threshold question is whether [these agreements are] enforceable." *Home Paramount Pest Control Companies, Inc. v. Shaffer*, 282 Va. 412, 420 (2011).

The Court starts with the non-compete agreement.  (Dkt. 7-3).  Under Virginia law, the non-compete agreement faces an uphill climb: "Covenants not to compete are restraints on trade and accordingly are not favored." *Motion Control Sys., Inc. v. East*, 262 Va. 33, 37, 546 S.E.2d 424, 425 (2001).  Accordingly, non-compete agreements are to be "strictly construed." *Alston Studios, Inc. v. Lloyd V. Gress & Assocs.*, 492 F.2d 279, 285 (4th Cir. 1974) (applying Virginia law).  In evaluating the enforceability of non-compete agreements, Virginia courts ask whether the agreement is (1) "narrowly drawn" to protect a legitimate business interest, (2) "not unduly burdensome" on the contracting party's "ability to earn a living," and (3) "not against public policy." *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 392–93 (2012); *see also Double Diamond Properties, LLC v. BP Prod. N. Am., Inc.*, 277 F. App'x 312, 317 (4th Cir. 2008) ("A court must 'consider (1) whether or not the agreement in question is reasonable as between the parties; and (2) if so, whether or not the agreement is injurious to the public interest by reason of its effect upon trade and, therefore, void.'" (quoting *Klaff v. Pratt*, 117 Va. 739 (1915)).  Additionally, courts are to consider the "function, geographical scope, and duration" of the agreement. *Simmons v. Miller*, 261 Va. 561, 581 (2001).  Finally, "when the non-compete

---

[3]      Defendants argue that the three agreements signed on October 21, 2015 (the "buy and sell agreement," the non-compete agreement, and the confidentiality agreement) all are part of one contract.  Plaintiff never responds to this argument, but under Virginia law, "where two papers are executed at the same time or contemporaneously between the same parties, in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument." *Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142, 151 (2001) (quoting *Oliver Refining Co. v. Portsmouth Cotton Oil Refining Corp.*, 109 Va. 513, 520 (1909)).  Accordingly, because documents were signed on the same day and reference interrelated obligations, the Court for present purposes is convinced that it is appropriate to consider the agreements jointly as one contract.

clause is ambiguous and susceptible to two or more differing interpretations, at least one of which is functionally overbroad, the clause is unenforceable." *Nortec Commc'ns, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226, 230 (E.D. Va. 2008) (citation omitted).[4]

The non-compete agreement's primary problem is that it is overbroad, and the Court concludes it is unenforceable as an unreasonable restraint of trade. The agreement states that FJUVO "shall not, in any manner, represent, provide services or engage in any aspects of business that would be deemed similar in nature to the business of Darton . . . ." (Dkt. 7-3). It continues by preventing FJUVO from "directly or indirectly engag[ing] in any business that would be considered similar in nature to with [*sic*] Darton Environmental, Inc, its subsidiaries, and any current or former clients and/or customers." (*Id.*). Under the agreement, FJUVO also may not "solicit any client, customer, officer, staff or employee for the benefit of [itself] or a third party that is or may be engaged in a similar business." (*Id.*).

This language is both ambiguous and overbroad. Its terms prevent FJUVO from engaging in "business that would be deemed similar in nature to the business of Darton." But Plaintiffs allege FJUVO "has historically been primarily engaged in collecting, refining and selling used cooking oil." (Dkt. 50 at ¶10). And so FJUVO's practice is almost identical and certainly "similar in nature to the business of Darton." These terms would force FJUVO to stop the work it had historically been engaged, a result that was both unanticipated by the parties and unreasonable. Plaintiff, in its opposition to the motion to dismiss, admits that reading this

---

[4]     The Court notes that the majority of these cases arise in the employment context and so may have some differences from the non-compete agreement here. However, Plaintiff relies on these same cases throughout its brief, conceding that "Defendants are correct that under Virginia law, restraints on trade are disfavored and must be strictly construed," (dkt. 63 at 13), and does not suggest any problems with the application of these cases here. While the Court notes the potential difference, and has independently looked for cases applying non-compete and confidentiality agreements in more analogous contexts, *see, e.g., Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 391 (2012) (evaluating non-compete between contractor and subcontractor), the Court does move forward applying this law to the non-compete and confidentiality agreements.

language by itself "would lead to an absurd result." (Dkt. 63 at 16). But its attempt to limit the terms to a "rational reading" that only protects "its specific method of 'heat and settle' refining" relies on limitations found nowhere in the agreement. (*Id.*). Parties cannot write facially overbroad non-compete agreements and then seek to tailor them after the fact.

The agreement's terms would likewise prevent FJUVO's ongoing solicitation of its own clients because it may not "solicit any client . . . engaged in a similar business." (Dkt. 7-3). This language is problematic because it goes far beyond Darton's proprietary technology and instead limits conduct that is "similar" to its general business. *See Klaff v. Pratt*, 86 S.E. 74, 78 (Va. 1915) ("The agreement restraining trade must be incidental to and in support of the contract or sale by which the one in whose favor it runs acquired some interest in the business he seeks to protect.") Again, any limitation on this broad language is only created by Plaintiff *ex post*; it is nowhere to be found in the agreement.

Finally, the agreement is missing traditional geographic and temporal limitations. Similar contracts containing no geographic scope have long been found unenforceable. *See Alston Studios, Inc. v. Lloyd V. Gress & Assocs.*, 492 F.2d 279, 283 (4th Cir. 1974) ("[B]ecause of its limitless geographic application . . . , we hold the provision unenforceable and void."). The non-compete purports to be in effect for ten years. (Dkt. 7-3). Plaintiff points to no contracts of this length that have been upheld.

Plaintiff responds by noting that the Supreme Court of Virginia has said "[t]he possession of trade secrets and confidential information is an important consideration in testing the reasonableness of a restriction on competition." *Meissel v. Finley*, 198 Va. 577, 583 (1956). While this is undoubtedly true, the non-compete here goes significantly beyond the underlying trade secrets at issue. It would instead prevent FJUVO from engaging in its day-to-day business, a result that Plaintiff acknowledges is absurd. The agreement is overbroad, even if it aims at

protecting legitimate interests.

Plaintiff's recourse to *Consol. Indus. Roofing v. Williams*, 17 Va. Cir. 341 (Roanoke Cir. Ct. 1989), is likewise unavailing. This thirty-year-old circuit court case simply stands for the unobjectionable proposition that non-compete agreements must be read holistically. While the Court does look at the whole agreement, the limiting terms Plaintiff seeks to introduce now are found nowhere on the face of the document. And unlike the agreement upheld in that case, which restricted competition within 150 miles of Roanoke for two years, there are no limiting principles in this agreement that save Plaintiff.

For these reasons, the non-compete agreement is unenforceable.

The Court now turns to the confidentiality agreement. (Dkt. 7-2). The parties both agree that "[t]he Supreme Court of Virginia applies the same test to confidentiality agreements as it does to noncompetition agreements." (Dkt. 63 at 18 (quoting *BB&T Ins. Servs., Inc. v. Thomas Rutherfoord, Inc.*, 80 Va. Cir. 174 (Richmond Cir. Ct. 2010)); dkt. 56 at 14 (same)). This principle seems to be well-recognized by Virginia courts. *See SanAir Techs. Lab., Inc. v. Burrington*, 91 Va. Cir. 206 (Chesterfield Cir. Ct. 2015) ("Virginia applies the same test non-solicitation agreements and confidentiality agreements as it does to non-compete agreements."); *Lasership Inc. v. Watson*, 79 Va. Cir. 205 (Fairfax Cir. Ct. 2009) ("[T]his Court applies the same test to confidentiality agreements that it does to noncompetition agreements.").

The first problem with the confidentiality agreement is that, unlike the ten year term in the non-compete, it contains no temporal limitation. (Dkt. 7-2). In an opinion affirmed by the Fourth Circuit, the Eastern District of Virginia has held that a provision that "indefinitely prohibited" disclosure was "not narrowly tailored to protect . . . legitimate business interests, thereby rendering it unenforceable under Virginia law." *Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 341 (E.D. Va. 2015), *aff'd*, 690 F. App'x 822 (4th Cir. 2017) (affirming

after noting "the confidentiality agreement . . . purported to restrict May in perpetuity, as it contained no time restrictions. Accordingly, because the confidentiality provision was not narrowly tailored to protect IDM's legitimate business interests, the court ruled that it was unenforceable under the applicable law."). Likewise, Virginia courts have held that "perpetuity restrictions" are "overly broad" and "unenforceable as a matter of law." *BB&T Ins. Servs., Inc. v. Thomas Rutherfoord, Inc.*, 80 Va. Cir. 174 (Richmond Cir. Ct. 2010); *see also Lasership Inc. v. Watson*, 79 Va. Cir. 205 (Fairfax Cir. Ct. 2009) ("[T]his provision prohibits Watson from telling a neighbor for the rest of her life *anything* about Lasership, including information that is not proprietary in nature or worthy of confidence. The clause is overly broad and is unenforceable as a matter of law." (emphasis in the original)). Plaintiff provides no response to this problem or other explanation for why such a restriction is necessary.[5]

Furthermore, the confidentiality agreement also has overbreadth problems. It defines the "confidential information" covered by the agreement to include:

> Technical and business information relating to [Darton's] proprietary ideas, patentable ideas copyrights and/or trade secrets, existing and/or contemplated products and services, software, schematics, research and development, production, costs, profit and margin information, finances and financial projections, customers, clients, marketing, and current or future business plans and models . . . .

(Dkt. 7-2). The vast majority of this definition recites types of information that Defendants never saw. While this would not necessarily be fatal by itself, it does demonstrate the agreement is "not narrowly tailored to protect . . . legitimate business interests[.]" *May*, 129 F. Supp. 3d at

---

[5]    Plaintiff's entire argument about the confidentiality agreement is found in two lines: "The Confidentiality Agreement is similar to the Non-Compete Agreement with regard to Virginia's three-part reasonableness test, with the exception that it does not contain an express limitation on duration. For the reasons stated in Section I.B above, the Confidentiality Agreement is reasonable and should be enforced." (Dkt. 63 at 18). But the confidentiality agreement has entirely different terms than the non-compete agreement, and so Plaintiff's previous analysis does not translate easily, if at all, to this context. Furthermore, after acknowledging the lack of limitation on duration, Plaintiff neglects to respond to Defendants' arguments about why this is problematic, citing no law in support of its *ipse dixit*.

341.  The bigger problem, however, is the inclusion of "[t]echnical and business information relating to [Darton's] proprietary ideas[.]"  As Plaintiff concedes, Defendant FJUVO was in a very similar line of business to itself, even before any alleged theft of trade secrets.  And so, the agreement's broad coverage of "business information relating to [Darton's] proprietary ideas" once again would prohibit the disclosure of much of FJUVO's own pre-existing business.

The combination of the lack of any temporal limitation and the overbreadth make this agreement unenforceable.

Perhaps anticipating these problems, Plaintiff asks the Court to rewrite the parties' agreements.  (Dkt. 68 at 19).  But Virginia courts have clearly and repeatedly stated "courts have no authority under Virginia law to 'blue pencil' or otherwise rewrite the contract to eliminate illegal overbreadth." *Update, Inc. v. Samilow*, 311 F. Supp. 3d 788 (E.D. Va. 2018); *see also Hair Club for Men, LLC v. Lailuma Ehson And Illusion Day Spa, LLC*, No. 1:16-CV-236, 2016 WL 4577019, at *3 (E.D. Va. Aug. 31, 2016); *Pitchford v. Oakwood Mobile Homes, Inc.*, 124 F. Supp. 2d 958, 965 (W.D. Va. 2000).  Plaintiff responds by pointing to the severability clauses in both the non-compete and confidentiality agreements.  But the non-compete agreement's problems infect each of the agreement's central clauses, and so the severability clause can provide Plaintiff no shelter.  *See also Lasership Inc. v. Watson*, 79 Va. Cir. 205 (Fairfax Cir. Ct. 2009) (declining to "blue pencil" non-compete agreement even when it contained severability clause).  And the confidentiality agreement *lacks* a necessary temporal limitation, something a severability clause cannot *add*.  That being said, based on the severability clauses, the Court does sever those agreements from the (now fully performed) "buy and sell" agreement that is also part of the contract.

In sum, while the "buy and sell" agreement is enforceable, the non-compete agreement and confidentiality agreement are unenforceable.  Count One will be dismissed because it is

predicated on an alleged breach of the non-compete and confidentiality agreements.

**B.     Count II: Conversion**

Plaintiff alleges Defendant FJUVO converted its property interest in the Darton technology. (Dkt. 50 at ¶¶62–65).[6] "Conversion is the wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights." *State of Maine v. Adams*, 277 Va. 230, 243 (2009). "An action for conversion can be maintained only by the person having a property interest in and entitled to the immediate possession of the item alleged to have been wrongfully converted." *Economopoulos v. Kolaitis*, 259 Va. 806, 814 (2000). Plaintiff's conversion claim fails for two independent reasons.

First, the Virginia Uniform Trade Secrets Act, discussed below, "displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret." Va. Code § 59.1-341(A). "[T]he plain language of the preemption provision indicates that the [VUTSA] was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret." *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 856 (E.D. Va. 2018) (citation omitted). "[O]nly those 'distinct theories of relief' that 'are supported by facts unrelated to the misappropriation of the trade secret' may escape preemption under the VUTSA." *Trident Prod. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 782 (E.D. Va. 2012) (quoting *Smithfield Ham & Products Co., Inc. v. Portion Pac, Inc.*, 905 F.Supp. 346, 348–49 (E.D.Va.1995)), *aff'd*, 505 F. App'x 242 (4th Cir. 2013).

Here, as in other suits that have found claims for conversion preempted by the Act, "it is

---

[6]     Plaintiff concedes that it has not alleged sufficient facts against the other Defendants. (Dkt. 63 at 22; dkt. 64 at 2).

clear from Plaintiff's pleadings that its conversion . . . claim[] [is] premised entirely on an alleged misappropriation of trade secrets." *Space Sys./Loral*, 306 F. Supp. 3d at 856. The claim that Defendants converted the "proprietary Darton technology" (dkt. 50 at ¶62), is the exact same as the alleged trade secret violation that Plaintiff asserts throughout its complaint. Because the conversion allegations are coextensive with the allegations that Defendants misappropriated a trade secret, the claim for conversion has been displaced by the Virginia Uniform Trade Secrets Act.[7]

Second, "[i]n general, a cause of action for conversion applies only to tangible property." *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994). However, the Virginia Supreme Court and many other courts have followed the Second Restatement of Torts in slightly expanding these traditional bounds by recognizing "the tort of conversion in cases where intangible property rights arise from or are merged with a document, such as a valid stock certificate, promissory note, or bond." *Id.* (citing Restatement (Second) of Torts § 242 and cmt. e (1965)). "Nevertheless, a cause of action for conversion does not encompass claims for interference with *undocumented* intangible property rights." *Id.* (emphasis in the original); *Orix Credit All., Inc. v. Young Express, Inc.*, 43 F. App'x 650, 654 n.3 (4th Cir. 2002) (stating that it "is an accurate statement of Virginia law" to say "there can be no conversion of an undocumented intangible asset"); *3D Glob. Sols., Inc. v. MVM, Inc.*, 552 F. Supp. 2d 1, 10 (D.D.C. 2008) ("Neither District of Columbia nor Virginia law recognizes a cause of action for conversion of intangible property." (citations omitted)); *Shenandoah Assocs. Ltd. P'ship v.*

---

[7]  Admittedly, this Court has sometimes found a preemption argument to be "premature" when a Plaintiff "has not yet proven its entitlement to relief under the VUTSA." *AWP, Inc. v. Commonwealth Excavating, Inc.*, No. 5:13CV031, 2013 WL 3830500, at *7 (W.D. Va. July 24, 2013). But in *AWP*, the conversion claim was not based "*entirely*," *id.* at *6 (emphasis in the original), on a claim for misappropriation of a trade secret. Because the claim here does entirely overlaps with the trade secret claim, the Court thinks the rationale for preemption laid out in *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 856 (E.D. Va. 2018), provides the better approach.

*Tirana*, 182 F. Supp. 2d 14, 22–23 (D.D.C. 2001) ("There is no precedent, however, for allowing conversion claims for undocumented intangible property rights.").[8]

Cases that have recognized conversion of trade secrets or confidential information have involved the taking of "presentations, documents, and other tangible material." *Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 420 (E.D. Va. 2011); *id.* ("This tangible material may properly support a conversion claim."); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, No. 3:09CV58, 2011 WL 4625760, at *1 (E.D. Va. Oct. 3, 2011) (recognizing conversion claim when alleged trade secrets "were in paper copies of DuPont documents and in a CD containing copies of DuPont documents"); *Hinkle Oil & Gas, Inc. v. Bowles Rice McDavid Graff & Love LLP*, 617 F. Supp. 2d 447, 454 (W.D. Va. 2008) ("Since the document 'symbolizes or embodies the right to property,' conversion of the document includes conversion of the intangible rights represented in the document."), *aff'd*, 360 F. App'x 400 (4th Cir. 2010). But Plaintiff has not alleged that the technology or trade secrets were ever written down in any documents, let alone that Defendant gained access to those documents. While Plaintiff does allege that Defendant FJUVO's representatives took a tour of the refining facility and took photographs, (dkt. 50 at ¶¶ 24, 44), Plaintiff points to no cases under Virginia law where anything remotely similar has sustained a claim for conversion.

Accordingly, Plaintiff's claim for conversion will be dismissed.[9]

## C.    Count III: Tortious Interference with Business Expectancy

Plaintiff's claim for tortious interference with business expectancy is alleged against

---

[8]    Plaintiff neglects to respond to Defendants' arguments on this point.

[9]    The Court does not rely on Defendant's alternative arguments concerning the economic loss rule. *See Combined Ins. Co. of Am. v. Wiest*, 578 F.Supp.2d 822, 832–33 (W.D.Va.2008) ("[T]he duty not to convert the property of another for one's own purposes exists in the absence of any contract, and thus provides the basis for an independent tort from the contract claims' arising out of the parties' relationship.").

Defendants TG Recycle Oil, Andy Chen, Green Oil Recycle, Daniel Zheng, and Adam Zheng; Plaintiff concedes it has no claim against Defendant FJUVO. Plaintiff must allege:

> (i) the existence of a valid contractual relationship or business expectancy; (ii) knowledge of the relationship or expectancy on the part of the interferor; (iii) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (iv) resultant damage to the party whose relationship or expectancy has been disrupted.

*DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 277 Va. 140, 145 (2009). Plaintiff fails to plausibly allege the first element, and so the claim will be dismissed.

The only specific business expectancy alleged by Plaintiff is "in continuing to receive refined oil from Defendant FJUVO at below market price, which Plaintiff could resell at a profit." (Dkt. 50 at ¶67). This allegation is a relic from Plaintiff's original complaint, which alleged Defendant breached the "buy and sell" agreement. (Dkt. 1 at ¶58). But Plaintiff now concedes Defendant delivered all the oil that it was owed under that contract. (Dkt. 42). Without a contract for more sales, "plaintiff's belief and hope that a business relationship will continue is inadequate to sustain the cause of action." *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 301 (1997).

Elsewhere in the complaint, Plaintiff does allege that it "has lost potential sales or licensing of the Darton technology." (Dkt. 50 at ¶77). But this allegation is entirely speculative, and contains none of the "factual context that [would] 'nudge' [Plaintiff's] claim 'from conceivable to plausible.'" *Hall v. DIRECTV, LLC*, 846 F.3d 757, 777 (4th Cir. 2017) (citation omitted). There are, for example, no allegations about who these potential sales were made to and whether they were even in a geographical location where Plaintiff was competing. The Court need not "accept as true [Plaintiff's] unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

Because Plaintiff has failed to adequately allege this fundamental element, this claim will

be dismissed as to all Defendants.[10]

### D. Counts IV and V: Statutory business conspiracy pursuant to Va. Code § 18.2-499(B) and common law business conspiracy

Plaintiff alleges Defendants formed both a statutory business conspiracy and a common law business conspiracy to wrongfully appropriate Plaintiff's technology. (Dkt. 50 at ¶82). The statutory business conspiracy claim derives from Va. Code § 18.2-499(B), which provides that "two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring another in his . . . trade [or] business . . . by any means whatever" shall be civilly liable for conspiracy. *See also Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 249 Va. 39, 47 (1995). In addition to this statutory basis for liability, "[a] common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Gelber v. Glock*, 293 Va. 497, 533 (2017). Neither Plaintiff nor Defendants distinguish between the two counts, and so the Court considers them together. *See Rosenthal v. R. W. Smith Co.*, 260 F. Supp. 3d 588, 593 (W.D. Va. 2017) ("Rosenthal's statutory and common law business conspiracy claims will be addressed together because they share the same fatal flaw—the lack of a conspiracy."). The complaint runs into two primary obstacles, both of which prove to be insurmountable.

First, under Virginia's doctrine of intracorporate immunity, "a single entity cannot

---

[10]    Furthermore, the Court notes that "[a] person cannot intentionally interfere with his own contract." *Fox v. Deese*, 234 Va. 412, 427 (1987). Plaintiff alleges that at least three of Defendants acted as agents of Defendant FJUVO. (Dkt. 50 at ¶17). To the extent Plaintiff alleges FJUVO conspired with its own agents, its claim fails. If Plaintiff is arguing these agents were "acting outside the scope of [their] employment" with FJUVO, *Fox*, 234 Va. 412, 427 (1987), it needs to make that allegation in its complaint instead of in its briefs. *See, e.g., Livia Properties, LLC v. Jones Lang LaSalle Americas, Inc.*, No. CIV.A. 5:14-00053, 2015 WL 4711585, at *7 (W.D. Va. Aug. 7, 2015) (dismissing claim because "there is no allegation that JLLA was acting outside the scope of that agency in its negotiations on Comcast's behalf"), *aff'd sub nom. Livia Properties, II, LLC v. Jones Lang LaSalle Americas, Inc.*, 646 F. App'x 322 (4th Cir. 2016).

conspire with itself." *Fox v. Deese*, 234 Va. 412, 428 (1987); *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) ("[U]nder the intracorporate immunity doctrine, acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation."); *Mician v. Catanzaro*, No. 2:17-CV-548, 2018 WL 2977398, at *5 (E.D. Va. June 13, 2018) ("[A] single entity, like a corporation, cannot conspire with itself because a conspiracy requires two or more persons."). Likewise, "an agent cannot conspire with its principal." *Michigan Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917, 925 (E.D. Va. 2000); *Mician*, 2018 WL 2977398, at *5 ("[A] conspiracy action cannot lie where a principal and its agent, or two agents of the same principal, are alleged to conspire with one another."). However, employees or agents of the same entity can conspire together if they are acting outside the scope of their employment or agency. *See Rosenthal v. R. W. Smith Co.*, 260 F. Supp. 3d 588, 593–94 (W.D. Va. 2017) ("[T]here cannot be a conspiracy between agents of a corporation operating within the scope of their duties."); *Vollette v. Watson*, 937 F. Supp. 2d 706, 727 (E.D. Va. 2013) ("[T]he 'intracorporate immunity doctrine,' which has been adopted by the Virginia Supreme Court and the Fourth Circuit, deems multiple defendants a single entity for the purpose of analyzing a civil conspiracy claim if such defendants are employees or agents of the same entity and are acting *within the scope* of their employment/agency." (emphasis in the original)).

Many of the pleadings only allege that individuals conspired with others within the same entity. For example, Plaintiff alleges that Defendants Andy Chen, Daniel Zheng, and Adam Zheng all negotiated with Plaintiff on Defendant FJUVO's behalf. (Dkt. 50 at ¶17). The complaint then alleges that "shortly after the agreements were signed and FJUVO representatives inspected the Darton refinery, *FJUVO and its agents* Chen and the Zhengs conspired together to breach the agreements." (*Id.* at ¶46 (emphasis added)). These, and similar allegations about FJUVO and its agents (*see, e.g., id.* at ¶44), repeatedly run into the same problem: "a conspiracy

action cannot lie where a principal and its agent, or two agents of the same principal, are alleged to conspire with one another." *Mician*, 2018 WL 2977398, at *5. Of course, Plaintiff could allege, as it has argued in its briefs, that FJUVO conspired with these individuals while they were acting outside the scope of their employment, but these allegations are nowhere to be found in the complaint.

The allegations concerning Defendants TG Recycle Oil and Green Oil Recycle fare no better. Plaintiff alleges "Defendants Chen and TG also conspired to use and in fact began to use the Darton technology in TG's refinery in Highland, Indiana." (*Id.* at ¶48). But Chen is alleged to be "the principal of TG." (*Id.* at ¶11).[11] Defendant TG Recycle Oil cannot conspire with its own principal. Of course, Chen may have been wearing a FJUVO hat during this alleged conspiring, but this is not alleged in the complaint. Similarly, the complaint alleges that "Defendants Daniel Zheng and GOR also conspired to use and in fact began to use the Darton technology at their refinery in Highland, Indiana." (*Id.* at ¶49). Because "Defendant Daniel Zheng is the principal of GOR," (*id.* at ¶12), these allegations again run into intracorporate immunity. Without more specific allegations about whether the individual Defendants were acting within the scope of their employment, the complaint does not plausibly allege a conspiracy.

Second and relatedly, many of the allegations that do allege conspiracy do so in only a conclusory manner. But "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Allegations that two Defendants "conspired" together "get[] the complaint close to stating a claim, but without some further factual enhancement [they] stop short of the line

_____

[11] The complaint also contradictorily alleges that Daniel Zheng was a member of Defendant TG Recycle Oil, (*see id.* at ¶4), but this appears to be a typographical error as he is associated with Defendant Green Oil Recycle throughout the rest of the complaint. (*Id.* at ¶¶12, 49).

between possibility and plausibility of 'entitle[ment] to relief.'" *Id.* at 557; *id.* at 556–57 ("Without more, parallel conduct does not suggest conspiracy."). Instead, Plaintiff "must show an agreement or a meeting of the minds by [the] defendants to" accomplish the conspiracy's purpose. *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011); *id.* at 347 (a claim for civil conspiracy fails if the plaintiff "fails to allege with any specificity the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made").

While Plaintiff's complaint contains conclusory allegations of conspiracy, the supporting factual content is missing. Plaintiff alleges that "shortly after the agreements were signed and FJUVO representatives inspected the Darton refinery, FJUVO and its agents Chen and the Zhengs conspired together to breach the agreements." (Dkt. 50 at ¶46). Under *Twombly*, these bare assertions that Defendants "conspired" stop short of the line between possibility and plausibility. Likewise, the allegations that "Defendants Chen and TG also conspired to use and in fact began to use the Darton technology in TG's refinery in Highland, Indiana," *id.* at ¶48, and that "Defendants Daniel Zheng and GOR also conspired to use and in fact began to use the Darton technology at their refinery in Highland, Indiana," *id.* at ¶49, throw around conclusions of conspiracy without any factual content about "the specific communications amongst the conspirators, or the manner in which any such communications were made." *A Soc'y Without A Name*, 655 F.3d at 347. More factual context is needed to "'nudge' [Plaintiff's] claim 'from conceivable to plausible.'" *Hall*, 846 F.3d at 777.

This lack of specificity is especially problematic when considered alongside the intracorporate immunity requirements. Plaintiff needed to plausibly allege that Defendants were either conspiring with individuals who not part of the same entity or that Defendants were acting outside the scope of their employment. It has not, and so the conspiracy claims will be

dismissed.

**E.     Count VI: Violation of Virginia Uniform Trade Secrets Act Va. Code § 59.1-336**

Finally, Plaintiff alleges all Defendants violated the Virginia Uniform Trade Secrets Act. "To establish a claim under the VUTSA, a plaintiff must prove that (1) the information in question constitutes a trade secret, and (2) the defendant misappropriated it." *Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 422 (E.D. Va. 2011); *Collelo v. Geographic Servs., Inc.*, 283 Va. 56, 68 (2012) (same). The Act defines "trade secret" as:

> information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
> >
> > 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va. Code § 59.1-336. The Act defines "misappropriation" as:

> 1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> 2. Disclosure or use of a trade secret of another without express or implied consent by a person who
>
> > a. Used improper means to acquire knowledge of the trade secret; or
> >
> > b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was
> >
> > > (1) Derived from or through a person who had utilized improper means to acquire it;
> > >
> > > (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;
> > >
> > > (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> > >
> > > (4) Acquired by accident or mistake.

Va. Code § 59.1-336. Unlike the other claims addressed above, Plaintiffs have plausibly alleged that each Defendant violated the Act.

The first and overarching question for all Defendants is whether the technology constitutes a trade secret. Plaintiff has plausibly alleged that it is. First, Plaintiff plausibly alleges that the Darton technology "derives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Va. Code § 59.1-336. Specifically, Plaintiff alleges "[t]he Darton technology is a significantly less labor-intensive and less costly means of refining than the centrifuge method" Defendants had been using. (Dkt. 50 at ¶15). The (admittedly unconsummated) negotiations for Plaintiff to build Defendant FJUVO a refining system further attest to this value. (*Id.* at ¶¶21, 22). Second, Plaintiff has plausibly alleged that the Darton technology "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Va. Code § 59.1-336. While largely unenforceable, Plaintiff negotiated agreements that limited Defendants access to the technology. (Dkt. 7-2; dkt. 7-3). Likewise, Plaintiff alleges that the individual Defendants "were all fully aware of the sensitive nature of the Darton technology, and of Darton's desire to maintain its proprietary nature." (Dkt. 50 at ¶15). In short, Plaintiff has plausibly alleged that the Darton technology was a trade secret.

Defendants' arguments that the technology is not a trade secret fail. Defendants point to diagrams of the technology, links to websites describing the technology, and a photograph in the Lynchburg News & Advance newspaper of Darton's refinery. (*See also* dkt. 62 at 12 ("Counsel for the Zheng Defendants found these exact same tanks available on the internet in the first search undertaken."). But these arguments all go well beyond the pleadings, and it would be inappropriate for the Court to consider them at this stage. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not

excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").

The second question is whether Plaintiff has plausibly alleged that each Defendant misappropriated the technology. Plaintiff has plausibly alleged that Defendants used Plaintiff's trade secret "without express or implied consent" and "knew or had reason to know" that their knowledge of the trade secret was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Va. Code § 59.1-336. In particular, Plaintiff has alleged that Defendants FJUVO, Andy Chen, Daniel Zheng, and Adam Zheng were part of the negotiations to view the technology (dkt. 50 at ¶¶17–18), understood that it was proprietary (*id.* at ¶45), and understood that they were only being given access for a limited purpose. (*Id.* at ¶¶24, 45). Plaintiff then alleged that these Defendants used this technology for their own purposes. (*Id.* at ¶¶46–50). Plaintiff has plausibly alleged that Defendants TG Recycle Oil and Green Oil Recycle acted through their principals, Defendants Chen and Daniel Cheng, to use the technology. (*Id.* at ¶¶48–50). At this stage, those two Defendants can be imputed the knowledge of their principals.

Defendants Green Oil Recycle, Adam Zheng, and Daniel Zheng raise one more defense under *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165 (2016). In that case, the Supreme Court of Virginia held that defendants could not be held liable under the Act for using technology because they had contractual rights to use it: "There can be no misappropriation where acquisition, disclosure, and use of a trade secret have been expressly authorized by contract." *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 206–07 (2016). There, the defendants were party to a contract that gave a valid and broad scope to use the technology, "employing such descriptions as 'perpetual,' 'worldwide,' 'for all purposes,' and 'without

restriction.'" *Id.* at 206. Here, of course, there was no such contractual grant of rights for these three Defendants (the contract was both limited in scope and with FJUVO). *Babcock & Wilcox* provides no shelter for Defendants.

Accordingly, the Virginia Uniform Trade Secrets Act claims all survive.

## IV. CONCLUSION

The complaint, as currently construed, states claims against Defendants under only the Virginia Uniform Trade Secrets Act. All other claims will be dismissed without prejudice, except for the contract claim which will be dismissed with prejudice. In its brief opposing the motion to dismiss, Plaintiff requests that "it be given the opportunity to amend its Complaint to cure [any] defect[s]." While this sort of request is not a proper motion to amend, *see Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008), the Court will address any such motion after it is made. *See also see Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014) ("Regardless of the merits of the desired amendment, a district court does not abuse its discretion by declining to grant a motion that was never properly made.").

An appropriate Order will issue, and the Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion to Plaintiffs, Defendants, and all counsel of record.

Entered this __1st__ day of August, 2018.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE